SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE

-----------------------------------------------------------------x

BMG MONROE I, LLC,

                         Petitioner-Plaintiff,

       -against-

TOWN OF MONROE; TOWN OF MONROE
TOWN BOARD; HARLEY DOLES, as Town
Supervisor; ANTHONY CARDONE, as Monroe
Town Boardmember and individually; RICHARD
COLON, as Monroe Town Boardmember;
MICHAEL McGINN, as a Monroe Town
Boardmember and individually; GERARD
McQUADE, JR., as Monroe Town Boardmember
and individually; and AUDRA SCHWARTZ, as
Town of Monroe Planning Board Chairperson,

                   Respondents-Defendants.

-----------------------------------------------------------------x

Index No. 6916 - 2016

**SUMMONS**

To the Persons Named as Defendants Above:

       YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an
answer to the Verified Petition-Complaint in this action within 20 days after the service of this
Summons, exclusive of the day of service, or within 30 days after service is complete if this
Summons is not personally delivered to you within the State of New York.  In case of your
failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the Verified Complaint.

       Plaintiff designates Orange County as the place of trial.  The basis for this designation is
that the principal offices of Respondents are located in Orange County and the actions
complained of in the Verified Petition-Complaint occurred in Orange County.

Dated: New York, New York
      October 11, 2016

                             SIVE, PAGET & RIESEL, P.C.
                             *Attorneys for Petitioner-Plaintiff*

By:                                           
                             Steven Barshov
                             460 Park Avenue
                             New York, New York 10022
                             (212) 421-2150
                             (212) 421-1891 (fax)

                             Ronald S. Kossar, Esq.
                             402 East Main Street
                             Middletown, New York 10940
                             (845) 343-5111
                             (845) 343-5222 (fax)

TO:     Town of Monroe
        Town Board of the Town of Monroe
        Mr. Harley Doles, Town Supervisor
        Mr. Anthony Cardone, Town Board Member
        Mr. Richard Colon, Town Board Member
        Mr. Michael McGinn, Town Board Member
        Mr. Gerard McQuade, Jr., Town Board Member
        Ms. Audra Schwartz, Town of Monroe Planning Board Chairperson

        1465 Orange Turnpike
        Monroe, NY 10950

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------------x

BMG MONROE I, LLC,

                    Petitioner-Plaintiff,

      -against-

TOWN OF MONROE; TOWN OF MONROE
TOWN BOARD; HARLEY DOLES, as Town
Supervisor; ANTHONY CARDONE, as Monroe
Town Boardmember and individually; RICHARD
COLON, as Monroe Town Boardmember;
MICHAEL McGINN, as a Monroe Town
Boardmember and individually; GERARD
McQUADE, JR., as Monroe Town Boardmember
and individually; and AUDRA SCHWARTZ, as
Town of Monroe Planning Board Chairperson,

                Respondents-Defendants.
------------------------------------------------------------x

Index No. 6916 - 2016

**ARTICLE 78 PETITION
AND VERIFIED COMPLAINT**

      COMES NOW BMG MONROE I, LLC ("BMG"), by and through its attorneys Sive,

Paget & Riesel, P.C. and Ronald S. Kossar, Esq., and for its hybrid Petition pursuant to Article

78 of the New York Civil Practice Law and Rules ("CPLR") and Verified Complaint, states as

follows:

## INTRODUCTION

      1.      BMG is the developer of a large scale residential cluster subdivision ("Smith

Farm" or the "Project") on property (the "Project Site") that is located in both the Town of

Monroe (the "Town") and the Village of Monroe (the "Village"). BMG received conditional

final approvals for the Project in 2015 from both the Town of Monroe Planning Board (the

"Town Planning Board") and the Village of Monroe Planning Board ("Village Planning Board")

– the culmination of a 14-year Project review that commenced in 2001. After issuance of these

conditional final Project approvals, BMG set to work to comply with the required conditions and

expended millions of dollars designing, constructing and installing Town and Village Planning Board mandated on- and off-site infrastructure, environmental mitigation measures, and Project improvements.

2.      Even though the Town's own Planning Board concluded that the Project would be the most appropriate use of the Project Site and even though the on- and off-site construction work undertaken by BMG was jointly ordered by the Town and Village Planning Boards, nevertheless, the Town Board of the Town of Monroe ("Town Board") proposed and adopted a moratorium on the issuance of all permits and approvals authorizing residential development and construction (the "Moratorium") and drafted the local law imposing the Moratorium (the "Moratorium Law") so it would apply even to projects, like Smith Farm, that had received final approvals.

3.      Drafting the Moratorium Law to apply to a Project that recently received final approvals and whose developer is actively constructing the very improvements and environmental mitigation measures mandated in those final approvals, is not only illegal for reasons enumerated in detail *infra*, but it makes absolutely no sense whatsoever. The Orange County Planning Department recognized these truths and, before the Moratorium Law was enacted, it advised the Town Board against imposing the Moratorium on projects that had been granted final approvals.

4.      BMG tried on multiple occasions to preclude the necessity of this litigation by strongly advising the Town Board during public hearings on the Moratorium Law that its adoption and application to BMG would unlawfully violate BMG's constitutionally protected vested rights. Even though BMG knew the exercise was highly likely to be futile, BMG in good faith still exhausted its administrative remedies and sought an exemption/variance from the

2

Town Board (the Exemption/Variance Application"). Even though not a single document nor any evidence of any kind was submitted in opposition to BMG's Exemption/Variance Application, the Town Board denied the Application without discussion and without making any findings of fact or conclusions of law. Having no other recourse, BMG commenced this litigation.

## SUMMARY OF CLAIMS

5.      This litigation challenges the facial validity of the Moratorium Law. Under settled and binding decisional law of the New York Court of Appeals and the Appellate Division, Second Department, the only legitimate basis for adoption of a moratorium is in response to an emergency or crisis or while a specific proposed amendment to a locality's comprehensive plan or land use laws has been proposed and is going through the review process. No emergency is referenced in the Moratorium Law and none exists. No proposed amendment to the Town's Comprehensive Master Plan ("CMP") or land use laws has been proposed. The Moratorium Law states that it has been enacted to freeze all significant residential development – even that of approved projects – while the Town "studies" its CMP and zoning law. That is not a permissible basis or justification for a moratorium and, thus, the Moratorium Law is facially invalid. *See* First Cause of Action, ¶¶ 123–128, *infra*.

6.      This litigation also challenges the Moratorium Law as applied to BMG and Smith Farm. Having expended millions of dollars on Project improvements, mitigation measures, and infrastructure mandated by the Town and Village Planning Boards, BMG's property rights in its Project approvals have vested. The Moratorium Law deprives BMG of its constitutionally protected vested rights by prohibiting issuance of even the most minor ministerial permits and approvals by Town officials and boards, thereby preventing BMG from continuing the

infrastructure installation work it commenced in the Village and must continue within the Town. The Moratorium is null and void as applied to BMG and the Project because it unlawfully deprives BMG of its vested property rights. This unlawful deprivation of vested property rights violates the Due Process Clauses of the United States and New York State Constitutions. *See* Second Cause of Action, ¶¶ 129–135, *infra*.

7.      BMG exhausted its administrative remedies under the Moratorium Law by filing with the Town Board BMG's "Exemption/Variance Application" (so termed because the Town Attorney has referred to the application as both an exemption and variance). BMG submitted hard dollars and cents proof confirming its vested rights, as well as confirming that it suffers severe economic hardship and no ability to use its property in any economically productive fashion while the Moratorium is in effect. No evidence was submitted in opposition to the Exemption/Variance Application, and no Town official consultant submitted any report or analysis in respect of the Exemption/Variance Application. Without any discussion, without making any findings of fact, and without stating any conclusions of law, the Town Board arbitrarily, capriciously, and contrary to law denied the Exemption/Variance Application. *See* Third Cause of Action, ¶¶ 136–146, *infra*.

8.      While the Exemption/Variance Application was pending, counsel for BMG informed the Town Board, in writing, that the Town Attorney, only days earlier, had correctly represented in open court to a federal judge that an <u>identical</u> proposed moratorium he drafted for the nearby Village of South Blooming Grove would not apply to residential developments with vested rights. Accordingly, the Town Board was informed that a denial of the Exemption/Variance Application would constitute a knowing and intentional abrogation of BMG's constitutionally protected vested rights and would subject Town Board members who

4

voted to deny the Exemption/Variance Application to both official and individual liability for damages and attorney's fees, pursuant to 42 U.S.C. §§ 1983 and to 1988. Nevertheless, the Town Board denied the Exemption/Variance Application. The arbitrary and capricious denial of the Exemption/Variance Application and the unlawful deprivation of BMG's vested rights violate the Due Process Clauses of the United States and New York State Constitution. The Town Boardmembers voting for denial knowingly and intentionally violated BMG's due process rights under the United States Constitution. *See* Fourth Cause of Action, ¶¶ 147–156, *infra*.

9.     The Town Board attempted to extend its initial three-month Moratorium in July of 2016 by purporting to adopt Local Law No. 2 of 2016 (the "First Moratorium Extension Law"). The Town Board failed to follow the mandatory procedures for adoption of a local law, including failing to give notice of and hold a public hearing, in violation of Town Code §§ 6.1 and 6.2 and New York Municipal Home Rule Law § 20. In addition, the Town Board failed to refer the proposed First Moratorium Extension Law to the Orange County Department of Planning in violation of New York General Municipal Law § 239-l and m. The failure to comply with these provisions constitute a jurisdictional defect that invalidates the First Moratorium Extension Law, thereby causing the Moratorium to have expired. *See* Fifth Cause of Action, ¶¶ 157–167, *infra*.

10.     BMG has been constructing and installing Project infrastructure, off-site Project improvements, mitigation measures, and on-Site Project improvements in order to satisfy the conditions of the final approvals issued by the Town and Village Planning Boards. That work has commenced within the Village and has been ongoing, but cannot continue in the Town because the Moratorium Law prohibits the issuance of all ministerial approvals and permits relating to the Project's construction. The Moratorium Law, *inter alia*: (a) prevents the Town of Monroe Planning Board Chairperson (the "Town Planning Board Chair") from signing the

Project's approved phase 1 final subdivision plat (the "Approved Final Plat"); (b) prevents the Town Board from approving the Public Improvement Security Agreement (the "PISA"), a routine agreement mandated by the Town Code and prepared by the Town Attorney securing BMG's obligation to construct required public improvements; (c) prevents the Town Board from approving a bank-issued letter of credit required by the Town Code to further secure BMG's obligations (the "Letter of Credit"); and (d) prevents the Town from issuing a land disturbance permit and/or similar permit required to authorize construction work in the Town. There is neither discretion nor any lawful basis for the Town's boards and officials to refuse to issue the foregoing permits and approvals. BMG is suing for an Order of Mandamus under CPLR Article 78 and for injunctive relief requiring the issuance of the aforementioned non-discretionary permits and approvals so it can continue to construct and install infrastructure, mitigation measures, and on-site and off-site Project improvements as mandated by the final approvals issued by the Town Planning Board. *See* Sixth Cause of Action, ¶¶ 168–175, *infra*.

11.     BMG respectfully demands that this Court, *inter alia*:

(a)     declare the Moratorium Law invalid and unlawful on its face;

(b)     declare the Moratorium Law to be an unlawful violation and deprivation of BMG's vested property rights, as applied;

(c)     annul and vacate the denial of the Exemption/Variance Application and issue an injunction ordering the Town Board to approve that Application;

(d)     declare the First Moratorium Extension Law to be invalid and to declare the Moratorium to have expired;

(e)     issue an injunction and/or order of mandamus requiring the Town to issue the ministerial approvals and undertake the ministerial actions needed to enable BMG to

6

construct and install Town Planning Board mandated infrastructure, mitigation measures and on-site and off-site Project improvements, specifically including: (i) approval of the PISA and Letter of Credit; (ii) signing of the Approved Final Plat by the Town Planning Board Chair; and (iii) issuance of land disturbance, clearing, and any other ministerial permit required for such construction and installation;

(f)     award BMG damages against all Respondents-Defendants, except the Town Planning Board Chair, for the losses caused and expenses incurred by BMG arising from and in connection with the adoption of the Moratorium Law, its application to BMG and the Project, the denial of the Exemption/Variance Application, the unlawful interference with and deprivation of BMG's vested constitutional rights, and the preclusion of Town officials and boards from issuing ministerial permits and approvals to which BMG is entitled, in an amount to be proven at trial;

(g)     reasonable attorneys' fees, costs and expenses of this litigation;

(h)     and such other relief as the Court deems appropriate.

## **PARTIES**

12.     BMG MONROE I, LLC is a limited liability corporation organized and existing under the laws of the State of New York, with its principal place of business located at c/o Ronald S. Kossar, Esq., 402 East Main Street, P.O. Box 548, Middletown, New York 10940.

13.     The TOWN OF MONROE is a township in Orange County, New York duly organized and lawfully existing under the Laws of the State of New York.   The Town's administrative offices are located at 1465 Orange Turnpike, Monroe, New York 10950.

14.     The TOWN BOARD OF THE TOWN OF MONROE is the governing body of the Town.   Its administrative offices are located at 1465 Orange Turnpike, Monroe, New York

10950.

15.     HARLEY DOLES is the duly elected Town Supervisor and member of the Town Board.  His address as Town Supervisor and Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950.  He is being sued in his official capacity.

16.     ANTHONY CARDONE is a duly elected Town Boardmember.  His address as Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950.  He is being sued in his individual and official capacities.

17.     RICHARD COLON is a duly elected Town Boardmember.  His address as Town Board member is 1465 Orange Turnpike, Monroe, New York 10950.  He is being sued in his official capacity.

18.     MICHAEL McGINN is a duly elected Town Boardmember.  His address as Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950.  He is being sued in his individual and official capacities.

19.     GERARD McQUADE, JR. is a duly elected Town Boardmember.  His address as Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950.  He is being sued in his individual and official capacities.

20.     AUDRA SCHWARTZ is the duly appointed Chairperson of the Town Planning Board.  Her address as Town Planning Board Chairperson is 1465 Orange Turnpike, Monroe, New York 10950.  She is being sued in her official capacity and solely because this lawsuit demands that this Court order the Planning Board Chair to sign the Project's approved final subdivision plat.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to CPLR §§ 301, 3001, and 7801 as well as 42 U.S.C. § 1983.

22.     Venue is in Orange County pursuant to CPLR § 506 because the offices of Respondents are located in Orange County and the actions complained of herein occurred in Orange County.

## FACTUAL BACKGOUND

**A. The Approved Project is an Integrated 181-Unit Residential Cluster Development Located Within Both the Town and Village.**

23.     The Project Site is a 78.93-acre tract of land of which approximately 59.5 acres is within the Town and approximately 19.4 acres is within the Village.  The Project Site is located near the intersection of Gilbert Street and Old Quaker Hill Road and consists of the lands within Section 203, Block 1, Lot 1.22 (Village) and Section 3, Block 1, Lot 8 (Town).

24.     Since the Project Site is located within both the Village and Town, discretionary land use approvals were required for the Project from both the Town and Village Planning Boards.  In 2015, conditional final approvals were issued by the Town and Village Planning Boards, as follows:

(a)     the Town Planning Board adopted a resolution entitled:  "Resolution of Approval – Subdivision, Site Plan, Local Wetlands Disturbance Permit and Special Permit for BMG Monroe I, LLC [the Smith Farm]" (the "Final Town Approval Resolution"), a true and correct copy of which is appended hereto as Exhibit A and incorporated herein by reference; and

(b)     the Village Planning Board adopted a resolution entitled:  "Resolution Making Certain Findings and Granting Cluster Subdivision Approval, Conditional Final Conditional Use Approval, Conditional Final Site Plan Approval for a Proposed Multifamily

Residential Project Known as 'The Smith Farm'" (the "Final Village Approval Resolution"), a true and correct copy of which is appended hereto as Exhibit B and incorporated herein by reference.  (Collectively, the Final Town Approval Resolution and the Final Village Approval Resolution are referred to herein as the "Final Approval Resolutions.")

25.     Smith Farm is a residential cluster subdivision of 181 units including 54 duplex units (of which 36 are age-restricted to those who are 55 and older), 64 patio homes and 63 detached single family homes.  (Ex. A, Final Town Approval Resolution at 2; Ex. B, Final Village Approval Resolution at 2.)

26.     The Town and Village Planning Boards both confirmed in their respective Final Approval Resolutions that the Project is planned and will be developed and operated as a single, unified whole notwithstanding the municipal boundary running through the site.  (Ex. A, Final Town Approval Resolution at 1; Ex. B, Final Village Approval Resolution at 2.)

27.     Of the 181 approved residential units, more than two-thirds are to be built in the Town.  Specifically, 137 residential units are to be built within the Town, consisting of 52 of the 64 patio homes, all of the 63 single family detached units, and 22 of the 36 duplex units in 11 semi-attached buildings.  (Ex. A, Final Town Approval Resolution at 2.)  In addition to the aforementioned 137 units, also to be constructed in the Town as part of the Project are water system improvements, components of the Project's outdoor recreation areas, the internal road network and emergency access, pedestrian circulation network and stormwater management facilities (the "Town Project Site Improvements").  (Ex. A, Final Town Approval Resolution at 2.)

28.     Of the 181 approved residential units, 44 units are to be built in the Village consisting of 12 single family detached units and 32 duplex units in 16 semi-detached buildings.

10

(Ex. B, Final Village Approval Resolution at 3.)  Also to be constructed in the Village as part of the Project are a community center with a recreation/community building with a pool complex, components of the Project's outdoor recreation areas, the internal road network and emergency access, pedestrian circulation network and stormwater management facilities (the "Village Project Site Improvements").  (Ex. B, Final Village Approval Resolution at 3.)  (Collectively, the Town and Village Project Site Improvements are referred to as the "Project Site Improvements".)

29.     In addition to the Project Site Improvements, BMG is also required to undertake various mitigation measures jointly mandated by the Town and Village Planning Boards in the joint findings statement issued at the culmination of the Project's environmental review (the "Mitigation Measures").

30.     The Town and Village Planning Boards also mandated improvements outside the Project Site some of which are within the Village and some of which are within the Town (collectively, the "Off-Site Improvements"), and which include: (a) various Mitigation Measures; (b) connections for water and sewer service; (c) improvements to Gilbert Street, including installation of a water line upgrade, a parallel drainage system, pedestrian facilities, and pavement improvements; and (d) signalization of the Gilbert Street/Route 17M intersection. (Ex. B, Village Final Approval Resolution at 3; Ex. A, Final Town Approval Resolution at 10, ¶ 5 (incorporating by reference required improvements ordered by the Village in the Final Village Approval Resolution.)

31.     The Final Town Approval Resolution includes specific findings that the Project is in the public interest, consistent with Town's master plan, consistent with the Town's land use laws, and an appropriate use of the Project Site:

> [T]his cluster subdivision promotes flexibility of design and development of land and constitutes the most appropriate use of

11

<u>land</u> and facilitates the adequate and economical provision of streets and utilities and preserves the natural and scenic qualities of open land . . .

[A]pproval of the Site Plan and Special Permit <u>will substantially serve the public convenience, safety and welfare; will not be detrimental to the neighborhood or the residents thereof;</u> and will not otherwise be detrimental to the public convenience or welfare, subject to compliance in full with conditions hereinafter imposed….

[T]he arrangement, location, and width of streets, their relation to the topography of the land, water supply, sewage disposal, drainage, lot sizes and arrangement, <u>the possible future development of adjoining land as yet un-subdivided</u> are all <u>appropriate and consistent with the requirements of the master plan, the official map, the Town of Monroe Subdivision Regulations and applicable zoning regulations,</u> subject to compliance with conditions hereinafter imposed.

Ex. A, Final Town Approval Resolution at 7 (emphasis added).

32.     The Town Planning Board expressly acknowledged that the Project included substantial necessary public improvements and required that "[g]iven the complexity and magnitude of this application, these improvements shall be completed according to the schedule set forth in a Public Improvement Security Agreement."   Ex. A, Final Town Approval Resolution at 8.

33.     The Planning Board expressly authorized the Planning Board Chair to sign the Project subdivision plat upon satisfaction of the conditions precedent to such signing.  Ex. A, Final Town Approval Resolution at 8.

## B.  The Final Approval Resolutions Were Preceded by an Exhaustive 14-Year Review and Issuance of All Required Discretionary Approvals by State and Local Agencies.

34.     The Project was first proposed in 2001.  BMG did not request a rezoning or variance, and the Project was designed in conformity with the applicable Town and Village zoning.

35.     The Project's required discretionary actions triggered the New York State Environmental Quality Review Act ("SEQRA").  On December 17, 2001, the Village Planning Board was designated lead agency, and for purposes of SEQRA, the Town Planning Board functioned as an involved agency.

36.     In 2002, the Village Planning Board issued a positive declaration.  A draft environmental impact statement ("DEIS") was submitted in 2003.  In 2005, the DEIS was accepted as complete by the Village Planning Board, which then held public hearings on the DEIS.  In 2006, the Village Planning Board accepted the final environmental impact statement ("FEIS").

37.     On June 19, 2006, the Village and Town Planning Boards concluded the five-year environmental review process by issuing a joint Findings Statement entitled "Lead Agency SEQRA Findings Statement and Joint Town of Monroe Planning Board SEQRA Findings Statement for Smith Farm/Gilbert Street" (the "2006 Joint Findings Statement"), a true and correct copy of which is appended hereto as Exhibit C and incorporated by reference herein.

38.     The 2006 Joint Findings Statement concluded that the Project, with its identified Mitigation Measures, would minimize or avoid to the maximum extent practicable adverse environmental effects.  The 29-page single-spaced 2006 Joint Findings Statement addresses each and every subject area of potential environmental concern, identifies potential adverse environmental impacts, and sets forth the Mitigation Measures.

39.     Included in the 2006 Joint Findings Statement are required public and Project improvements and Mitigation Measures that, in final form, became the Project Site Improvements, the Mitigation Measures, and the Off-Site Improvements mandated as conditions of the Project's approval in the Final Approval Resolutions.

40.     The 2006 Joint Findings Statement lists the principal future approvals required for the Project, including those to be issued from New York State and Orange County agencies (collectively, the "Post-2006 Principal Project Approvals"):

| Agency | Approval |
|---|---|
| Village of Monroe Planning Board | (1) Conditional Use Permit; Site Plan Approval<br>(2) Cluster Authorization (Village Code 200-47-D)<br>(3) Subdivision Approval for project and for lot line change |
| Town of Monroe Planning Board | (1) Special Use Permit; Site Plan Approval<br>(2) Local Wetland Buffer Encroachment Permit<br>(3) Cluster Authorization (Town Code A-65-2-B)<br>(4) Subdivision Approval |
| Monroe Village Board | (1) Sewer Extension<br>(2) Water District<br>(3) Cluster Authorization to Planning Board (Village Law 7-738) |
| Monroe Town Board | (1) Sewer Extension |
| Orange County Health Department | (1) Water Extension<br>(2) Realty Subdivision |
| New York State Department of Health (NYSDOH) | (1) Water Extension |
| New York State Department of Conservation (NYSDEC) | (1) Sewer Extension (Under authority granted by NYSDOH)<br>(2) SPDES General Permit (Stormwater)<br>(3) Water District Extension |
| Village of Monroe Building Department | (1) Building Permit (Administrative Review Post Approval) |
| Town of Monroe Building Department | (1) Building Permit (Administrative Review Post Approval) |
| Village of Monroe Highway Department | (1) Road Opening Permit<br>(2) Curb Cut Permit |
| New York State Department of Transportation (NYSDOT) | (1) Highway Work Permit |
| Orange County Sewer District No. 1 | (1) Sewer Connection |
| Orange County Department of Planning | (1) General Municipal Law (Section 239-l) |

Ex. C, 2006 Joint Findings Statement at 4.

41.     In contemplation that obtaining the Post-2006 Principal Project Approvals would take significant time, the 2006 Joint Findings Statement confirmed that the Town and the Village Planning Boards would grant preliminary land use approvals for the Project and that such preliminary approvals would be extended so the Project would remain active. Ex. C, 2006 Joint

Findings Statement at 9, § 5.1.3, par. 2.c.  Consistent with the 2006 Joint Findings Statement, the Town Planning Board on September 14, 2006 adopted a resolution granting the Project cluster approval, preliminary conditional use approval, preliminary site plan approval, and approval of a local wetland permit (the "Preliminary Town Approval Resolution"), a true and correct copy of which is appended hereto as Exhibit D and incorporated by reference herein.  The Preliminary Town Approval Resolution lists 34 plans that received preliminary approval with conditions and one plan that received preliminary and conditional final approval.

42.     Similarly, on August 21, 21006, the Village Planning Board adopted a resolution granting the Project cluster approval, preliminary conditional use approval, and preliminary site plan approval (the "Preliminary Village Approval Resolution"), a true and correct copy of which is appended hereto as Exhibit E and incorporated by reference herein.  The Preliminary Town and Village Approval Resolutions are collectively referred to hereinafter as the "Preliminary Approval Resolutions."

43.     In reliance upon the Preliminary Approval Resolutions, BMG undertook the process of applying for and obtaining the Post-2006 Principal Project Approvals.  BMG was granted a series of extensions to the Preliminary Approval Resolutions as BMG pursued the Post-2006 Principal Project Approvals.

44.     Of the required Post-2006 Principal Project Approvals, BMG obtained the following from New York State and Orange County agencies:

(a)     Orange County Department of Health ("OCDOH"):    Water Main Extension Approval, September 20, 2010;

(b)     NYSDEC: State Pollutant Discharge Elimination System ("SPDES") General Permit, December 23, 2010;

(c)     Orange County Department of Environmental Facilities and Services ("OCDEF"):  Orange County Sewer District No. 1 Millpond Parkway Bypass Approval, August 9, 2011;

(d)     NYSDEC and OCDEF:    Stamped Sanitary Sewer Collection System Extension, October 28, 2011;

(e)     NYSDEC:  Sewer Main Extension Approval, November 16, 2011;

(f)     OCDEF:  Sanitary Sewer Construction Permit, December 19, 2011;

(g)     OCDOH:  Realty Subdivision Approval Letter, April 1, 2015;

(h)     New York State Department of Transportation ("NYSDOT"):  Highway Work Permit for road work and Highway Work Permit for utility work, both issued on April 21, 2015; and

(i)     OCDOH:  Phase I Final Realty Subdivision Approval Drawings (March 16, 2016) and Letter (March 23, 2016).

45.     When BMG could reasonably foresee obtaining the Post-2006 Principal Project Approvals, it applied for final approvals from the Town and Village Planning Boards.  On July 7, 2014, the Village Planning Board forwarded BMG's final approval application to the Orange County Department of Planning ("Orange County Planning") for its mandatory review under New York State General Municipal Law § 239-n.  Orange County Planning responded on July 24, 2014 with advisory comments and recommended approval.  A true and correct copy of this response is appended hereto as Exhibit F and incorporated by reference herein.

46.     Upon request by the Village Planning Board, as lead agency under SEQRA, BMG's consultant completed an updated Intersection Capacity Analysis and Signal Warrant Analysis for the Gilbert Street–NYS Route 17M intersections on October 13, 2014.  The Village

Planning Board's consultant reviewed the updated analysis on January 9, 2015.

47.     On August 10, 2015, the Village Planning Board, as lead agency under SEQRA, completed its updated environmental review of the Project.  The Village and Town Planning Boards issued the "Amended Lead Agency Findings Statement and Joint Involved Agency Findings Statement" (the "2015 Joint Findings Statement") in which the Planning Boards updated the 2006 Joint Findings Statement.  A true and correct copy of the 2015 Joint Findings Statement is appended hereto as Exhibit G and incorporated by reference herein.

48.     The 2015 Joint Findings Statement contains the following findings and certification by the Town and Village Planning Boards:

> Based on a thorough consideration of the previous Findings Statement, all previous written facts and conclusions, and all subsequent studies and updated information submitted, the Village and Town of Monroe Planning Boards certify that with this Amended Findings Statement
>
> a. The requirements of 6 NYCRR Part 617 have been met, and that
>
> b. Consistent with the social, economic and other essential considerations, from among the reasonable alternatives thereto, the action to be approved is one that <u>minimizes or avoids adverse environmental effects to the maximum extent practicable</u>. . . and
>
> c. Consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided by incorporating as conditions to the decision those mitigative measures that were identified as practicable.

Ex. G, 2015 Joint Findings Statement at 11 (emphasis added).

49.     The 2015 Joint Findings Statement includes the final required Mitigation Measures for the Project.  The Final Approval Resolutions incorporate and mandate the construction and installation of the Mitigation Measures specified in the 2015 Joint Findings Statement.

50.     On the same day the Planning Boards issued the 2015 Joint Findings Statement, the Planning Boards adopted the Final Approval Resolutions. *See* Exhibits A and B.

51.     BMG revised its site plan in accordance with the Final Approval Resolutions, and on October 2, 2015, it submitted the revised final site plan to the Village and Town Planning Boards. BMG received engineering approval of the final site plan on October 7, 2015, allowing it to submit the revised final site plan to the Village and Town Planning Boards for signature, which BMG did on October 15, 2015.

52.     Both Village and Town Planning Board Chairs signed the revised final site plan. Thereupon, BMG sought ministerial approvals from the Village Building Inspector to authorize work to begin on required Project Improvements and Off-Site Improvements. Such approvals were sought from the Village Building Inspector because the work to be done initially was within the Village.

## C. BMG Expended Millions of Dollars to Design and Construct Project and Off-Site Improvements, as well as to Pay Recreation and Other Government Fees.

53.     BMG has expended millions of dollars on the Project. Its expenditures began with the purchase of the Project Site on June 15, 1999 for $1.1 million. BMG incurred approximately $100,000 for due diligence and closing costs, bringing its acquisition costs to $1.2 million. In 2008, BMG paid off the mortgage on the Project Site for $4.5 million, thereby bringing its total acquisition costs to $5.7 million.

54.     Since BMG's acquisition of the Project Site, it has expended approximately $1.95 million on engineering, Project design, legal, and consulting services.

55.     To date, BMG has expended approximately $3.85 million on construction of Project Improvements, Mitigation Measures, and Off-Site Improvements mandated by the 2015 Joint Findings Statement and the Final Approval Resolutions.

56.    Three photographs, appended hereto as Exhibit H and incorporated herein by reference, which were taken in the weeks prior to commencement of this litigation, show the type of ongoing construction involved in the installation of Project Improvements, Mitigation Measures, and Off-Site Improvements, as well as the heavy construction equipment required for such work.

57.    The following is a list of the principal expenditures and actions taken by BMG in reliance on the issuance of the Final Approval Resolutions and the other permits and approvals issued for the Project:

a.    BMG posted letter of credit performance bonds with the Village and Town:  (i) Village performance bond for on-site work:  $3,222,550.65; (ii) Village performance bond for off-site work:  $1,154,538; and (iii) Town performance bond for off-site work: $797,984.55;

b.    BMG paid $185,000 to the Village pursuant to a Sewer Use Agreement with the Village;

c.    BMG paid $479,500 to the Town for Parkland and Recreation fees for the entire Project;

d.    BMG paid to the Town $55,915.86 for Town inspection fees;

e.    BMG entered into construction contracts and construction management contracts for construction of the Project Improvements and Off-Site Improvements and has paid millions of dollars for those services, as described above;

f.    BMG made irrevocable dedications of its property to the Village;

g.    BMG cleared portions of the Project Site in preparation for Phase I construction;

      h.     BMG implemented the Stormwater Pollution Prevention Plan (SWPPP) approved by the NYSDEC; and

      i.     BMG paid $133,000 toward the costs of design and installation of a traffic signal at the intersection of Gilbert Street and NYS Route 17M.

**D.  After the Final Approval Resolutions Were Issued and in the Midst of Construction of the Project Improvements, Mitigation Measures, and Off-Site Improvements, the Town Board Proposed Adoption of the Moratorium Law.**

58.    In April 2016, after the Town and Village Planning Boards had both granted conditional final approval for the Project and while construction of Project Improvements, Mitigation Measures and Off-Site Improvements in the Village was well underway, the Town Board proposed adoption of a local law which would impose a moratorium on issuance of all approvals for residential development, including in respect of projects that had been previously approved and were under construction, like the Project (the "Proposed Moratorium Law), a true and correct copy of which is appended hereto as Exhibit I and incorporated herein by reference.

59.    As set forth in Section 1 of the Proposed Moratorium Law, its purpose would be to prevent further development of residential construction while the Town Board would undertake a review of the Town's Comprehensive Master Plan ("CMP") and its land use laws. No specific amendments to the Town's CMP or zoning are proposed or referenced in the Proposed Moratorium Law.

60.    Section 2 of the Proposed Moratorium Law called for the prohibition on issuance every kind of approval conceivable relating in any way to residential development, including ministerial approvals for previously approved projects, even those under construction:

    Section 2.  Scope of moratorium.

    A. Moratorium on the issuance of residential building permits and other actions:  No building permit application shall be accepted, and no pending building permit application shall be further

<u>processed or approved</u>. . . .

B. Moratorium on actions by the Town Board, Planning Board and Zoning Board of Appeals: The Town Board, Planning Board and Zoning Board of Appeals <u>shall not process,</u> hear, rehear, approve or <u>sign</u> any new or <u>pending</u> preliminary or <u>final site plan,</u> preliminary or <u>final subdivision,</u> special permit, variance or other land use application or permit which related directly or indirectly to residential construction, <u>including but not limited to any grading permit, erosion and sediment control permit, wetland permit, sewer connection permit, floodplain development permit, water connection permit, which may be granted in association with residential construction.</u>

Ex. I, Proposed Moratorium Law § 2 (emphasis added).

61.     The term of the Moratorium under the Proposed Moratorium Law would be three months, with the further provision that the Town Board could "by Local Law, extend the period of this moratorium for an additional three (3) months or such other and further time period that is reasonable and scope and duration." Ex. I, Proposed Moratorium Law § 5.

62.     The Proposed Moratorium Law included a delegation of authority to the Town Board to grant relief from the Moratorium "in its absolute discretion" upon a showing of "severe hardship" which the Proposed Moratorium Law defined as "no economic return on any land purchase." Ex. I, Proposed Moratorium Law § 3.

63.     The Proposed Moratorium Law was referred to Orange County Planning Department ("OCPD") for review under GML §§ 239-l and 239-m. OCPD issued a review letter (the "Moratorium 239 Review Letter") in which it explicitly cautioned the Town Board about many of the provisions that have given rise to this litigation. A true and correct copy of the Moratorium 239 Review Letter is appended hereto as Exhibit J and incorporated by reference herein.

64.     OCPD noted that the three-month Moratorium was proposed while the Town reviews and updates its Comprehensive Plan. OCPD advised the Town Board that

Comprehensive Plan updates typically require significantly longer than three months:

> We advise the Town that Comprehensive Plan updates undertaken recently by other municipalities throughout the County and region have required, on average, more than a year to complete. . . . We advise the Town, therefore, to determine whether three months is sufficient to review and analyze the existing Comprehensive Plan and propose meaningful updates.

Ex. J, Moratorium 239 Review Letter at 1 (emphasis added).

65.     OCPD focused in detail on the effect that the Proposed Moratorium Law would have on residential developments – like the Project – that had been granted final approvals, as well as the requirement for "severe" hardship to obtain an exemption from the Moratorium. OCPD expressed very strong reservations and cautioned the Town Board that application of the Moratorium to an approved project could cause significant hardship. OCPD encouraged the Town Board to consider exempting projects with final approvals from the Moratorium:

> [T]here is expected to be a set of projects with varying levels of existing approvals, including potentially final approval from the planning board, that will be affected by the moratorium as written. These projects should be inventoried prior to any moratorium taking effect, as the proposed requirement for relief from the moratorium to evidence "severe" hardship, equaling a showing of "no economic return on any land purchase." The use of the term "severe" is unusual in this context. As such moratoria on projects given conditional final or final approval can impose a significant hardship. While it can be permissible to enact the same, it is the Department's recommendation that the Board take a true "hard look" at moratoria on projects with that level of approval status. The Department is not making any binding comment on the same but encourages the Board to consider whether it is appropriate to exempt all (or even portions) of those projects from the moratorium.

Ex. J, Moratorium 239 Review Letter at 1-2 (emphasis added).

66.     The Town Board held public hearings on the Proposed Moratorium Law in April 2016. BMG, through counsel, appeared at the hearing and spoke in opposition to the Proposed Moratorium Law and its application to BMG and Smith Farm. In addition, BMG, through

22

counsel, submitted written comments to the Town Board dated April 21, 2106 in opposition to the Proposed Moratorium Law (the "BMG Proposed Moratorium Law Comment Letter"), a true and correct copy of which is appended hereto as Exhibit K and incorporated by reference herein.

67.     In its oral statements and with the BMG Proposed Moratorium Law Comment Letter, BMG raised many of the same concerns articulated by OCPD.  BMG informed the Town Board that BMG had obtained conditional final Project approvals, had expended millions of dollars on the Project in reliance on the approvals issued, and would suffer severe hardship if the Moratorium were imposed on the Project.  BMG further informed the Town Board that it had vested rights in the approvals it had received for the Project and that the Proposed Moratorium Law, if enacted, would unlawfully violate and deprive BMG of its protected vested rights.  Ex. K, BMG Proposed Moratorium Law Comment Letter at 2–3.

68.     Like OCPD, BMG also informed the Town Board that there was no possibility that a review and update of the CMP could be undertaken in three months and that such a process would require in excess of one year, likely longer.  Ex. K, BMG Proposed Moratorium Law Comment Letter at 3.

69.     Written comments on the Proposed Moratorium Law were also submitted on behalf of multiple property owners with residential projects in various stages of development approval (the "Property Owners Moratorium Comment Letters") reiterating many of the same comments submitted by BMG, including the unreasonableness and illegality of applying the Proposed Moratorium Law to properties and projects where property rights had vested.  True and correct copies of the Property Owners Moratorium Comment Letters are appended hereto as Exhibit L and incorporated herein by reference.

70.     Multiple comment letters and oral comments in support of the Proposed

Moratorium Law were submitted by people characterizing themselves as residents of the Town for many years (the "Residents Moratorium Comment Letters"). A true and correct copy of the Residents Moratorium Comment Letters is appended as Exhibit M and incorporated by reference herein.

71.    The Residents Moratorium Comment Letters demand the enactment of the Proposed Moratorium Law to defeat and obstruct residential growth and development in the Town, particularly such growth and development perceived to be by or on behalf of the Hasidic Jewish community in nearby Kiryas Joel. *See* Letter from Claus H. Luhrssen, Ex. M, Residents Moratorium Comment Letters at 1 (calling for the enactment of the Proposed Moratorium Law to thwart the so-called "Kiryas Joel Power Elite"); *see also* multiple emails sent by various individuals but obviously crafted by the same organizers because the same words are repeated verbatim, including a demand for the Moratorium so the Town Board can "save OUR QUALITY OF LIFE!!!"; that large scale builders area getting paid millions to put in developments and care nothing about the local residents' homes and life style; that high density housing is not conducive to the residents' rural lifestyle; and that the Town Board should be held accountable to the local residents. Ex. M, Residents Moratorium Comment Letters.

72.    The Proposed Moratorium Law was the product of very strong political pressure by local residents, especially mobilized by the United Monroe organization, which has a long track record of opposing development of housing for the Kiryas Joel community. Two of the candidates strongly supported by United Monroe, Town Boardmembers McGinn and Cardone, were elected to the Town Board and are staunch proponents of the Moratorium.

**E. Disregarding OCPD's and BMG's Comments, and Bowing to Intense Political Pressure, the Town Board Adopted the Proposed Moratorium Law.**

73.    There is no evidence in the record of proceedings before the Town Board

24

concerning the Proposed Moratorium Law that it ever undertook any of the analyses or took the "hard look" at the effect the Proposed Moratorium Law would have on previously approved projects, all as recommended by OCPD. Instead, on April 25, 2016, the Town Board adopted the Moratorium Law, a true and correct copy of the Moratorium Law is appended hereto as Exhibit N and incorporated by reference herein.

74.     The Moratorium Law as adopted is identical to the Proposed Moratorium Law insofar as is relevant to this litigation. In adopting the Moratorium Law, no Town Board member proposed any amendments to the Proposed Moratorium Law in response to the BMG Proposed Moratorium Law Comment Letter or the Moratorium 239 Review Letter. Instead, the Town Board simply acceded to the strident voices in the community demanding a halt to any significant residential development in the Town.

75.     Indicative of the stridency of community opposition, at the beginning of every Town Board meeting, at the end of the Pledge of Allegiance, the members from United Monroe in attendance yell out the last two words of the Pledge, as follows: "with liberty and justice FOR ALL!" The clear message is that unless United Monroe obtains what it wants—in this case the Moratorium—then the Town Board will be denying its local citizens and residents justice. This is just one form of overt political pressure that was exerted on the Town Board to force the adoption of the Moratorium Law.

76.     The term of the Moratorium Law was kept at three months even though BMG and OCPD informed the Town Board that such a period of time was impossible for study of the CMP and the Town's land use laws, as well as formulation, consideration and adoption of any proposed changes to either or both. The Town Board knows that fact as well but chose to keep the period for the Moratorium at three months so that "severe hardship" would be artificially

measured against three-month blocks of time and would be far more difficult to demonstrate than if the Town Board was forthright and acknowledged the true required duration of its planning and zoning review. Indeed, the Moratorium Law was already extended once and on October 7, 2016, the Town Board gave notice of a public hearing to be held on a proposed local to extend the Moratorium Law a second time.

77.     The Moratorium Law has an immediate effect on the Project.  It prohibits the Town Planning Board Chair from signing the Project's Approved Final Plat.  It prohibits the Town Board from approving the PISA and the Letter of Credit.  It prohibits the Town from issuing any land disturbance or clearing permits for construction of Project Improvements, Mitigation Measures, and Off-Site Improvements in the Town.

78.     The Moratorium Law also holds in abeyance any default approvals that might otherwise occur given inaction due to the moratorium: Section 2.C of the Moratorium Law provides: "To the extent that any provision of New York State Town Law imposes a time frame for action by a municipal entity, board or body so that a default approval will result from any inaction, the time for any action required by any Town Board, Body, Agency or other entity shall be and is hereby extended until this moratorium and any as well as all extensions thereof have expired and have not been extended by the Town Board."

79.     Thus, the Moratorium Law, during its pendency, prohibits development of the Project, and brings all significant new residential development in the Town to a halt.

## F. The Moratorium is not in Response to an Emergency and is not Stop-Gap Zoning.

80.     The Moratorium Law contains no findings that the Town faces any actual crisis or emergency or that the Moratorium Law is enacted in response to any crisis or emergency condition.  Section 1.C of the Moratorium Law states that the "Town Board finds that factors in

connection with development or potential development in the Town as well as the potential development of a land within the surrounding areas may have a significant impact on the health, safety and general welfare of the Town . . .". (Emphasis added.) Ex. N, Moratorium Law at 2. The Town Board is unable to document a definite significant impact on health, safety and welfare from development or potential development, no less an actual emergency.   The Moratorium Law ignores the express findings to the contrary about the suitability of the Project and its consistency with the Town's health, safety and welfare that are specifically expressed by the Town and Village Planning Boards less than one year earlier in the Final Approval Resolutions.

81.     The Moratorium Law does not state that it is adopted to preserve the *status quo* while specific proposed amendments to the Town's CMP or zoning laws are considered by the Town Board.  There are no proposed local laws pending to amend the Town's CMP or zoning laws; thus the Moratorium Law is not interim or "stop-gap" zoning.

82.     Section 1.F of the Moratorium Law states that "The Town Board hereby finds that the adoption of a moratorium on the development of residential construction will best maintain the status quo during the study period in order to prevent interim development from frustrating the objectives of the study."  As to the Project, the only way such "frustration" could occur would be if future CMP and zoning law amendments preclude that which is currently allowed by the Final Approval Resolutions and the other permits and approvals for the Project obtained by BMG.

83.     In respect of BMG, the intent of the Moratorium Law is obvious:  prevent BMG from further developing the Project and further vesting its rights so that the applicable zoning

27

can be changed and BMG's vested property rights prejudiced.  As applied to BMG, no other purpose for the Moratorium Law is possible.

### G. The Town Board Extended the Moratorium Law Without Giving Notice of a Public Hearing or Referral to Orange County Planning.

84.    As predicted by both BMG and OCPD, the Town was unable to complete the CMP review and zoning law update process within the initial three month moratorium period. Indeed, the Town had not even completed the first step in the process within the initial three month moratorium period – obtaining a report identifying the baseline conditions in the Town.

85.    At the July 18, 2016 Town Board meeting, the Town Board considered whether to extend the Moratorium.   On information and belief, no proposed local law extending the Moratorium Law had been posted, no notice of public hearing had given, and no referral of the proposed First Moratorium Extension Law had been made to OCPD, per General Municipal Law §§ 239-l and m.

86.    On July 25, 2016, the Town Clerk of the Town of Monroe filed with the New York State Department of State ("NYSDOS") a copy of the First Moratorium Extension Law, denominated as Local Law No. 2 of 2016 and entitled "Implementing an Extension of the Moratorium on the Development of Residential Property of the Unincorporated Town of Monroe, New York."   A true and correct copy of First Moratorium Extension Law and the NYSDOS submittal forms are appended as Exhibit O and incorporated herein by reference.

### H. To Complete a Good Faith Review of the Town's CMP and Zoning Laws Will Require Multiple Additional Three-Month Period Extensions.

87.    Upon information and belief, the Town did not have a CMP until 1990, and it was reviewed, updated, and adopted since then on at least three occasions.

88.    In 2016, at or about the time the Moratorium Law was enacted, the Town Board

retained a land planning firm to undertake a review of the Town's CMP. The first step in that review was for the Town's consultant to prepare a report detailing the current conditions in the Town – a so-called "baseline" study. A draft of that study was submitted to the Town Board in August, 2016, more than three months after the Moratorium Law was enacted and approximately half way through the three-month extension adopted by the First Moratorium Extension Law..

89. As detailed to the Town Board by the Town's planning consultant, the CMP update process will include: (a) preparation of the draft baseline study; (b) circulation of the draft baseline study for review, comment and revision; (c) review and acceptance of the baseline study by the Town Board; (d) a series of community-wide meetings at which the public will provide input and suggestions concerning the Town's CMP; (e) preparation of a survey of the public to ascertain public concerns and thoughts about the future of the Town and its CMP; (f) synthesis and evaluation of the input received from the community-wide meetings and the survey; (g) preparation of proposed revisions to the Town's CMP; (h) review of proposed revisions by the Town Board; (h) public hearing and comment on proposed revisions to the Town's CMP; (i) submittal of proposed CMP revisions to Orange County Planning for review pursuant to GML § 239; (j) undertake required environmental review of proposed CMP amendments or revisions, including evaluation of whether the CMP revisions trigger the necessity for preparation of an environmental impact statement under SEQRA; (k) complete whatever environmental review process is required; and (l) finalize proposed CMP revisions and Town Board vote.

90. It is impossible for the Town Board to complete its review of the CMP within any less than nine months and, at the pace the review is presently proceeding, the process just to review and study the CMP is likely to require more than one year.

91. If the CMP review and revision process recommends amendments to the Town's

land use laws, then the Town Board would have to undertake another process which would include:   (a) drafting proposed local laws; (b) undertaking an environmental review and determining whether such local laws require preparation of an environmental impact statement pursuant to SEQRA; (c) submitting such local laws to Orange County Planning for review under General Municipal Law § 239; (d) holding public hearings and receiving public comment; (e) finalizing the proposed local laws' language; and (f) voting on such local laws.  This process is highly likely to require at least six months but could be longer if an environmental impact statement was prepared in conjunction with the proposed CMP revisions.

92.     The Town Board adopted the First Moratorium Extension Law imposing only a three-month Moratorium extension even though it knew or should have known that it would be impossible within that period of time to study, propose, and adopt revisions to the CMP and/or the Town's land use laws.

93.     On October 7, 2016, the Town Board posted notice on its website that it would hold a public hearing on October 17, 2016 on the proposed adoption of a Second Moratorium Extension Law.  No copy of the proposed Second Moratorium Extension Law was posted.

## I. BMG Exhausts Administrative Remedies and Files an Exemption/Variance Application Supported by Hard Dollars and Cents Proof of Vested Rights and Severe Hardship.

94.     Section 3 of the Moratorium Law authorizes the Town Board to grant an exemption/variance from the Moratorium if: (1) the Moratorium imposes severe hardship; (2) granting the exemption/variance is consistent with the health, safety, and general welfare of the inhabitants of the Town and their property; and (3) granting the exemption/variance is in harmony with the spirit and purposes of the Moratorium Law.

95.     On June 23, 2016, BMG filed its 24-page Exemption/Variance Application, a true and correct copy of which is appended as Exhibit P and incorporated herein by reference.  In the

Exemption/Variance Application, BMG detailed the multiple discretionary and ministerial approvals it had received for the Project, as well as the millions of dollars expended in reliance thereon. *See* Ex. P, Exemption/Variance Application at 9–11, 19.

96.     The Exemption/Variance Application also detailed the ongoing carrying costs for the Project, which are approximately $1,500.00 per day.  BMG has already incurred more than $100,000 in carrying costs for the period in which the Moratorium has been in effect.  Given that it is impossible for the CMP and Land Use Law review and update process to end in any less than nine months to one year, BMG will have suffered a loss in excess of $400,000 from carrying costs alone, while BMG is prohibited from moving forward with its approved Project and making any economically productive use of the Project Site.

97.     The Exemption/Variance Application reminded the Town Board that the Town and Village Planning Boards, as recently as 2015, had made detailed findings that the Project would not harm the public's health, safety, and general welfare; would substantially serve the public convenience, safety, and welfare; and would not be detrimental to the surrounding neighborhood or its residents.  Ex. P, Exemption/Variance Application at 12–13.

98.     Regarding harmony with the Moratorium Law, the Exemption/Variance Application cited the Town Planning Board's findings that the Project promotes flexibility of design and development of land; constitutes the most appropriate use of land and facilities; preserves the natural and scenic qualities of open land; and is appropriate and consistent with the requirements of the master plan, the official map, the Town subdivision regulations, and applicable zoning regulations.  Ex. P, Exemption/Variance Application at 12–13.

## J. BMG Informs the Town Board That the Town Attorney Represented to a Federal Judge that an Identical Moratorium Law He Drafted Would Not Apply to a Project With Vested Rights.

99.     The Town Attorney, Dennis Lynch, is also counsel to the neighboring Village of

31

South Blooming Grove ("SBG").

100.    Mr. Lynch drafted the Moratorium Law and also drafted a virtually identical proposed moratorium law for SBG.   The proposed SBG moratorium law is, in all material respects, a verbatim repetition of the Moratorium Law at issue in this case.

101.    The proposed SBG moratorium law was the subject of proceedings before the United States Bankruptcy Court for the Eastern District of New York during which Mr. Lynch appeared on behalf of SBG and Mr. Steven Barshov (counsel for Petitioner-Plaintiff here) appeared on behalf of the debtor, Keen Equities, LLC.   Keen sought a temporary restraining order and preliminary injunction preventing SBG from holding a public hearing on the proposed adoption of the SBG moratorium law.

102.    In the course of oral argument before the Bankruptcy Judge, Mr. Lynch stated on the record that a property owner with vested rights would be exempt from the proposed SBG moratorium law. *See* the accompanying affirmation of Steven Barshov, Esq., affirmed October 11, 2016 (the "Barshov Affirmation").

103.    Mr. Lynch repeated this statement and legal conclusion publicly as was reported in an August 19, 2016 Times Herald-Record article by Richard J. Bayne, a true and correct copy of which is appended to the Barshov Affirmation as Exhibit A.

104.    An August 26, 2016, Steven Barshov on behalf of BMG, wrote to the Town Board (copying the Town Attorney, Mr. Lynch) and informing the Town Board of Mr. Lynch's representation to the Federal Bankruptcy Court Judge that projects with vested rights would be exempt from an identical moratorium law to the Moratorium Law in effect in the Town (the "8/26/16 Barshov Letter").   A copy of 8/26/16 Barshov Letter is appended hereto as Exhibit Q and is incorporated herein by reference.

105.    The 8/26/16 Barshov Letter informed the Town Board that a denial of BMG's Exemption/Variance Application would not merely be unlawful, but would be a knowing and intentional violation and deprivation of BMG's constitutionally protected vested property rights, since Mr. Lynch's representation that projects with vested rights would be exempt from the proposed SBG moratorium law applied with equal force and effect to the identically worded Moratorium Law.

## K.  No Evidence was Submitted in Opposition to BMG's Exemption/Variance Application, Which the Town Board Denied Without Discussion, Findings, or Legal Conclusions.

106.    The Town Board conducted its first hearing on the Exemption/Variance Application on July 11, 2016.  Subsequent hearings were conducted on July 18, 2016 and August 8, 2016, at which the public hearing was held open for 10 days for submission of written comments.

107.    No written comments were submitted in opposition to the Exemption/Variance Application.  The Town Board retained no consultants to evaluate the Exemption/Variance Application and received no reports or evidence (other than that submitted by BMG) in relation to the Exemption/Variance Application.

108.    At the September 14, 2016 Town Board meeting, Town Boardmember Colon was not in attendance.  The Town Board went into executive session to discuss the threat of litigation at the beginning of its meeting.  Following the executive session, a motion was made to deny the Exemption/Variance Application and it received a second.  There was no discussion of the motion or of the Exemption/Variance Application.  A vote was taken on the motion, and Town Board members Cardone, McGinn, and McQuade voted to deny the Exemption/Variance Application.  Town Supervisor Doles abstained from the vote.

109.    The Town Board made no findings of fact and articulated no conclusions of law

33

regarding the Exemption/Variance Application.

**L. The Moratorium Law and Denial of the Exemption/Variance Application, as well as Delay by the Town Attorney, Have Prevented Issuance of Land Disturbance and/or Clearing Permits, Approval of the PISA and Letter of Credit, and Signing of the Approved Final Plat.**

110.    As stated *supra*, BMG requires a land disturbance and/or clearing permit to construct and install Project Improvements, Mitigation Measures and Off-Site Improvements in the Town.  Prerequisites for issuance of such permits include approval of the PISA and Letter of Credit.  A prerequisite to receiving a building permit is the signing of the Approved Final Plat by the Town Planning Board Chair.

111.    Counsel for the Town confirmed in writing that the necessary Site Clearing Application for a land disturbance and/or clearing permit would not be considered and acted upon unless either the Exemption/Variance Application was granted or the Moratorium expired. *See* Letter from Brian D. Nugent to Ronald S. Kossar, dated May 24, 2016 at 2, a true and correct copy of which is appended hereto as Exhibit R and incorporated herein by reference.

112.    Under the Town Code, the Town Attorney is to draft the PISA at BMG's expense. The Town Attorney who predated Mr. Lynch had drafted the PISA, but after Mr. Lynch was appointed Town attorney, he stated that he wanted to review the PISA.

113.    What ensued was a protracted period in which it became increasingly clear that it would be impossible to obtain the promised review of the PISA and the final language from the Town Attorney or his colleagues at his firm.

114.    Mr. Lynch and BMG's project counsel, Ronald Kossar, Esq., repeatedly exchanged emails in which it is readily apparent that Mr. Lynch is not cooperating in revising a document that his predecessor, not BMG or its counsel, had drafted.  A true and correct copy of those emails are appended hereto as Exhibit S and are incorporated herein by reference.

115.    The delays by Mr. Lynch occurred at the same time as the Town Board had the Exemption/Variance Application before it.  Mr. Lynch failed to finalize the language of the PISA prior to the denial of the Exemption/Variance Application.

116.    In addition, in accordance with the Town Code, BMG presented the required Letter of Credit which was issued by Sterling National Bank on its standard form.

117.    In mid-July 2016, Mr. Lynch, raised 10 concerns with the Letter of Credit, particularly regarding its attachments and the clarity of its language.

118.    The Bank asked the Town to provide specific replacement language and edits such that the Bank could evaluate whether it could make the requested amendments.

119.    As of the filing of this Verified Petition and Complaint, the Town Attorney has still not provided any specific proposed changes to the Letter of Credit.

120.    Without finalization and approval of the PISA and Letter of Credit, the conditions in the Approved Final Plat will not have been met. The Town Attorney's obstruction in the finalization of the PISA and Letter of Credit, along with the denial of the Exemption/Variance Application, have precluded the signing of the Approved Final Plat by the Planning Board Chair.

121.    Finally, the Town Attorney makes clear that even if the PISA and Letter of Credit were finalized, there would be no action on either.  The Town Attorney states in his email of August 12, 2016:  "First, I don't understand the time pressure you seem to want everyone to experience.  I thought there was a moratorium in effect?  Am I wrong?"  Ex. S, August 12, 2016 Email from Dennis Lynch to Ronald Kossar.

**M. Having Exhausted Its Administrative Remedies, BMG Commenced This Litigation.**

122.    Having received a denial of its Exemption/Variance Application and having thereby exhausted all available administrative remedies for the illegal acts of the Town Board in

respect of enactment of the Moratorium Law and the denial of the Exemption/Variance Application, BMG had no choice but to commence this litigation in order to vindicate its rights and seek appropriate relief from this Court.

<div align="center">

### AS AND FOR A FIRST CAUSE OF ACTION

**THE MORATORIUM LAW IS FACIALLY INVALID BECAUSE IT IS NOT IN RESPONSE TO A CRISIS OR EMERGENCY AND IS NOT STOP-GAP ZONING**

</div>

123.    The allegations in Paragraphs 1 through 122 hereof are repeated and incorporated by reference herein.

124.    Binding and settled decisional law from the New York State Court of Appeals and Appellate Division, Second Department, mandates that a moratorium on land use development, as well as issuance of land use approvals and permits, must be either: (a) a narrowly crafted response to an actual emergency or crisis condition; or (b) to preserve the status quo as to projects without vested rights while a local law amending a locality's comprehensive plan or land use laws has been proposed for adoption (so-called "stop-gap" or interim zoning").

125.    The Moratorium Law contains no findings that the Town faces any actual crisis or emergency of any kind.

126.    The purpose of the Moratorium Law is to freeze all significant residential development, including approved projects, while the Town studies its CMP and its land use laws to determine whether either or both require revision.   The Town Board has proposed no amendments to the Town's land use laws or CMP and the Moratorium Law references none. Thus, the Moratorium Law is not interim or "stop-gap" zoning.

127.    Because there is no crisis or emergency facing the Town and no proposed amendment of its land use laws, the Moratorium Law has no legal basis and is facially invalid.

<div align="center">36</div>

128.    Accordingly, BMG requests a declaratory judgment holding that the Moratorium Law on its face is null, void, and of no force and effect, as well as a permanent injunction preventing the Town from adopting such an illegal Moratorium in the future.

## AS AND FOR A SECOND CAUSE OF ACTION

### THE MORATORIUM LAW IS UNCONSTITUTIONAL AS APPLIED TO BMG BECAUSE IT UNLAWFULLY DEPRIVES BMG OF ITS VESTED RIGHTS

129.    The allegations in Paragraphs 1 through 122 hereof are repeated and incorporated by reference herein.

130.    The Due Process Clauses of the U.S. and New York Constitutions prohibit the deprivation of vested property rights through unlawful government actions.

131.    The Moratorium Law is unconstitutional as applied to BMG because BMG's property rights have vested and the Moratorium Law is unlawful on its face.

132.    Even if not unlawful on its face, the Moratorium Law cannot lawfully be applied to BMG and the Project because BMG has constitutionally protected vested rights in the permits and approvals issued for the Project.  Under New York State law property rights in lawfully issued permits and approvals vest once the property owner or permit holder has undertaken substantial construction and or otherwise made substantial expenditures in reliance on the lawfully issued permits and approvals.

133.    BMG has been lawfully issued the Final Approval Resolutions, multiple additional State, County and Local discretionary approvals for the Project, multiple additional ministerial approvals, and has expended millions of dollars in reliance upon all of the permits and approvals for the Project.  BMG's expenditures have been made in significant part to construct Project Improvements, Mitigation Measures, and Off-Site Improvements that are

required as conditions of the 2015 Joint Findings Statement and the Final Approval Resolutions.

134.    BMG's property rights in all of the approvals it has received for the Project have vested.

135.    The Moratorium Law unlawfully deprives BMG of its vested property rights in violation of the Due Process Clauses of the U.S. and New York Constitutions, and as such BMG seeks a declaratory judgment that the Moratorium Law is null, void, and of no force and effect as applied to BMG.  BMG also seeks a permanent injunction preventing the Town or any of its officials or boards, from applying enforcing the Moratorium Law against BMG or the Project.

## AS AND FOR A THIRD CAUSE OF ACTION

### THE DENIAL OF BMG'S EXEMPTION/VARIANCE APPLICATION BY THE TOWN BOARD WAS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW.

136.    The allegations in Paragraphs 1 through 122 hereof are repeated and incorporated by reference herein.

137.    Article 78 of the New York Civil Practice Law and Rules allows judicial review of administrative determinations made by government bodies and officials that are alleged to be arbitrary, capricious, or contrary to law.

138.    Arbitrary and capricious decisions are those made without sound basis in reason and law, without supporting evidence in the administrative record, and/or without regard to the operative facts.

139.    The denial of BMG's Exemption/Variance Application is an administrative action that is reviewable by writ of certiorari on the administrative record by this Court pursuant to Article 78.

140.    The denial of the Exemption/Variance Application was arbitrary, capricious, and contrary to law because:  (a) BMG's rights in its approvals had vested; (b) the Moratorium Law

imposes severe hardship on BMG; and (c) because the Exemption/Variance Application meets the criteria established in Section 3 of the Moratorium Law.

141.   The only evidence in the administrative record is that the Moratorium Law imposes a severe hardship on BMG and the Project.   The Moratorium Law prohibits BMG from making any productive use of its property or the approvals for the Project it has been issued.   The Project is an integrated whole, as explicitly confirmed by the Town and Village Planning Boards in the Final Approval Resolutions.   The Moratorium Law prevents BMG from obtaining the permits and approvals from Town boards and officials that are necessary for BMG to complete the construction and installation of Project Improvements, Mitigation Measures and Off-Site Improvements that are mandatory conditions of the Final Approval Resolutions.   BMG is unable to obtain a building permit for the construction of any homes anywhere in the Project unless it complies with the conditions mandated in the Final Approval Resolutions.   Among the most important of those conditions is the construction and installation of the Town and Village Planning Board mandated Project Improvements, Mitigation Measures and Off-Site Improvements.   Thus, the Moratorium Law prevents BMG from undertaking and completing the work needed to satisfy the conditions for issuance of any building permits for home construction. Without such building permits, BMG cannot build and sell homes.   Without being able to build and sell homes, BMG has no economically productive use of its property or of the Project.   The Moratorium Law imposes severe hardship on BMG.

142.   The only evidence in the record before the Town Board is that granting the Exemption/Variance Application would not adversely affect the public's health, safety, and welfare.   The Town and Village Planning Boards in the 2015 Joint Findings Statement and Final Approval Resolutions specifically found that the Project was the most appropriate use of the

Project Site; that the Project mitigated environmental effects to the maximum extent practicable; that the Project would not adversely impact neighboring properties or the community, generally; and that the Project would not harm the public's health, safety and welfare. During the course of the public hearing on the Exemption/Variance Application, no evidence was tendered to the Town Board to question, no less challenge or rebut, those findings of the Town and Village Planning Boards.

143.    Finally, the grant of the Exemption/Variance Application is in harmony with the spirit and purposes of the Moratorium Law. That Moratorium Law is to ostensibly to preserve the status quo vis-à-vis so the Town can study its CMP and land use laws. Because of BMG's vested rights, the Town does not have the authority to amend its CMP and land use laws to prevent BMG from building the Project in accordance with the Final Approval Resolutions. Thus, whatever the purpose may be of the Moratorium Law, it cannot be to pave the way for a rezoning or other limitation on the Project, as approved.

144.    In addition, the Town Planning Board in the Final Town Approval Resolution explicitly found that the Project, including its design and layout, was appropriate in relation to the CMP, the Town official Map, the Town's land use laws, and even the "possible future development of adjoining land as yet un-subdivided." Ex. A, Final Town Approval Resolution at 7. No evidence to the contrary was tendered to the Town Board to address, no less contradict any of the foregoing.

145.    Given the extensive evidence that BMG's Exemption/Variance Application meets the criteria established in the Moratorium Law, the complete lack of any contrary evidence in the administrative record, and the fact that the Town Board denied BMG's Exemption/Variance Application without any discussion, findings of fact, or any conclusions of law, the Town

Board's denial of BMG's Exemption/Variance Application was arbitrary, capricious, and contrary to law in violation of Article 78 of the Civil Practice Law and Rules.

146.     BMG seeks a judgment annulling and vacating the denial of BMG's Exemption/Variance Application and a permanent injunction ordering the Town Board to grant the Exemption/Variance Application.

## AS AND FOR A FOURTH CAUSE OF ACTION

### THE DENIAL OF BMG'S EXEMPTION/VARIANCE APPLICATION APPLICATION IS UNCONSTITUTIONAL BECAUSE IT ARBITARILY AND UNLAWFULLY DEPRIVES BMG OF ITS VESTED RIGHTS.

147.     The allegations in Paragraphs 1 through 122 and Paragraphs 137 through 146 hereof are repeated and incorporated by reference herein.

148.     Title 42, Section 1983 of the U.S. Code provides that any person who, under color of state law, deprives a person of federal constitutional or statutory rights will be liable to the injured party.

149.     The Due Process Clauses of the U.S. and New York Constitutions prohibit the unlawful deprivation of vested property rights.

150.     The denial of BMG's Exemption/Variance Application is unconstitutional because BMG's property rights have vested and the deprivation of those rights through the denial of BMG's Exemption/Variance Application was arbitrary, capricious, and contrary to law.

151.     The Town Board's vote to deny BMG's Exemption/Variance Application was arbitrary because there is no evidence in the record that BMG's rights had not vested, that BMG will not suffer financial hardship as a result of the Moratorium, or that there is any lawful basis for the Moratorium Law.  In addition, the Town Board failed to identify any evidence, find any facts, or make any conclusions of law that would support its denial of the Exemption/Variance

41

Application.

152.    The 8/26/16 Barshov Letter to the Town Board afforded the Town Board clear written advance notice that BMG's rights had vested, that failure to exempt BMG from the Moratorium Law would violate its constitutionally protected rights, and that denial of the Exemption/Variance Application would subject Town Board members who voted in favor of denial to official and individual liability for damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988.    Despite this notice, Respondents-Defendants Cardone, McGinn, and McQuade voted to deny BMG's Variance Application.

153.    The denial of BMG's Variance Application, under color of state law, arbitrarily deprives BMG of its vested property rights in violation of the Due Process Clause of the U.S. Constitution, the Due Process Clause of the New York Constitution, and 42 U.S.C. § 1983.

154.    Accordingly, BMG seeks a judgment annulling and vacating the denial of BMG's Exemption/Variance Application and permanent injunction mandating the Town Board to grant BMG's Exemption/Variance Application.

155.    BMG also seeks an award of damages of no less than $1,500 for each day that the illegal moratorium remains in force against the Project and the Project Site, plus such additional sums as will be established at trial to compensate BMG for its monetary injuries and losses.

156.    In addition, BMG seeks an award of reasonable attorneys' fees, as well as costs and expenses of litigation under 42 U.S.C. § 1988.

## AS AND FOR A FIFTH CAUSE OF ACTION

### THE FIRST MORATORIUM EXTENSION
### LAW WAS NOT LAWFULLY ADOPTED.

157.   The allegations in Paragraphs 1 through 122 hereof are repeated and incorporated by reference herein.

158.   The Town Board's adoption of the First Moratorium Extension Law is contrary to law because the Town Board failed to follow the Town Code and mandatory New York State statutory procedure for adopting the First Moratorium Extension Law.

159.   Monroe Town Code § 6-2 requires the Town Clerk to post a copy of a proposed local law with a notice of hearing.

160.   Monroe Town Code § 6-1 requires the Town Board, before adopting a local law, to hold a public hearing on the proposed local law within 30 days of public notice of the hearing.

161.   Similarly, New York Municipal Home Rule Law § 20 requires public notice of a public hearing on a proposed local law and a public hearing on the proposed local law.

162.   Per New York General Municipal Law §§ 239-l and 239-m, before the Town Board could adopt the First Moratorium Extension Law, it must refer the proposed local law to the OCPD, which has 30 days to provide recommendations to the Town Board.

163.   The Town Board did not follow these procedures in adopting the First Moratorium Extension Law.

164.   While the NYSDOS submittal forms for the First Moratorium Extension Law state that the First Moratorium Extension Law was passed on July 18, 2016, the Town Board meeting on this date did not include a public hearing or vote on a proposed version of the First Moratorium Extension Law.  Rather, the Town Board and members of the public appeared to be discussing the idea of extending the Moratorium, and the Town Board ultimately voted to close

43

the public discussion as to this issue and adopt the First Moratorium Extension Law. However, on information and belief, at no time before July 18, 2016 did the Town Board post a copy of a proposed version of First Moratorium Extension Law for public review or give notice of a public hearing to be held thereon.

165.   On information and belief, the Town Board did not refer the First Moratorium Extension Law to OCPD for review under GML § 239-l and –m before its adoption. Failure to refer the First Moratorium Extension Law to OCPD is a jurisdictional defect rendering enactment of the local law invalid.

166.   Because the Town Board adopted the First Moratorium Extension Law without following the Town Code and New York State statutory procedure for adopting a local law, the First Moratorium Extension Law is invalid.

167.   Accordingly, BMG requests that the Court declare that the First Moratorium Extension Law was enacted in violation of the procedures required by New York law and is invalid, and that the Moratorium expired on July 25, 2016.   BMG requests a permanent injunction prohibiting the Town and all Town officials and Boards from enforcing or applying Moratorium Law to any property or project in the Town, including BMG and Smith Farm.

<div align="center">

### AS AND FOR A SIXTH CAUSE OF ACTION

**THE TOWN AND ITS BOARDS AND OFFICIALS ARE REQUIRED BY LAW TO UNDERTAKE THE FOLLOWING MINISTERIAL ACTS AND MANDAMUS LIES TO COMPEL THEIR PREFORMANCE, TO WIT:  SIGNING OF THE APPROVED FINAL PLAT; APPROVAL OF THE PISA, APPROVAL OF THE LETTER OF CREDIT, AND ISSUANCE OF MINISTERIAL LAND DISTURBANCE OR CLEARING PERMITS.**

</div>

168.   The allegations in Paragraphs 1 through 122 hereof are repeated and incorporated by reference herein.

169.   Article 78 of the New York Civil Practice Law and Rules, in the nature of a

mandamus to compel, allows judicial review of inaction or refusal to act by government bodies and officials and to compel performance of ministerial duties required by law.

170.    The Town Code requires the Town Attorney to draft the PISA and present it, along with the Letter of Credit, to the Town Board for approval.

171.    The PISA and Letter of Credit are routine, standard documents, the approval of which is a ministerial, nondiscretionary act.

172.    The Town attorney who predated Mr. Lynch, the current Town attorney, had drafted the PISA, and the Bank prepared the Letter of Credit on its standard form.

173.    Mr. Lynch has taken issue with both documents yet has failed to revise the PISA and provide edits to the proposed Letter of Credit that the Bank can evaluate for potential revision of the Letter of Credit.  He is obligated to do so under the Town Code and has no discretion in the matter.  Approval of both is a prerequisite to the Planning Board Chair signing the Approved Final Plat.

174.    The Moratorium Law also prevents the Town Planning Board Chair from signing the Approved Final Plat and prevents the Town from issuing a land disturbance permits and/or similar permits required for infrastructure and Project improvement construction to occur.  As the Moratorium Law is unlawful both on its face and as applied to BMG and the Project, there is no lawful basis for the failure or refusal to issue these ministerial approvals and permits.

175.    Therefore, BMG seeks an order of mandamus and a permanent injunction mandating that the Town Board approve the PISA and Letter of Credit, the Town issue land disturbance and/or clearing permits to enable BMG to construct and install the mandated Project Improvements, Mitigation Measures, and Off-Site Improvements.

**WHEREFORE**, BMG prays for the following relief:

A.    A judgment declaring that the Moratorium Law on its face is null, void, and of no force and effect, as well as a permanent injunction preventing the Town from adopting such an illegal Moratorium in the future;

B.    A declaratory judgment that the Moratorium Law is null, void, and of no force and effect as applied to BMG, as well as a permanent injunction preventing the Town or any of its officials or boards, from applying enforcing the Moratorium Law against BMG or the Project;

C.    A judgment annulling and vacating the denial of BMG's Exemption/Variance application and issuing an injunction ordering the Town Board to approve the Exemption/Variance Application;

D.    A judgment declaring the First Moratorium Extension Law to be invalid and declaring the Moratorium to have expired;

E.    An injunction and/or order of mandamus requiring the Town to issue the ministerial approvals and undertake the ministerial actions needed to enable BMG to continue its current and ongoing construction and installation of Project Improvements, Mitigation Measures and Off-Site Improvements, including (i) approval of the PISA and Letter of Credit; (ii) signing by the Town Planning Board Chair of the Approved Final Plat; and (iii) issuance of the land disturbance and clearing permit(s);

F.    An award of damages against all Respondents-Defendants, except the Town Planning Board Chair, for the losses caused and expenses incurred by BMG arising from and in connection with the adoption of the Moratorium Law, its

application to BMG and the Project, the denial of the Exemption/Variance Application, the unlawful interference with and deprivation of BMG's vested constitutional rights, and the preclusion of Town officials and boards from issuing ministerial permits and approvals to which BMG is entitled, in an amount to be proven at trial;

G.   An award of reasonable attorneys' fees, costs and expenses of this litigation; and

H.   An award of such other relief as the Court deems appropriate.

Dated: New York, New York
        October 11, 2016

<div style="margin-left:40%">

SIVE, PAGET & RIESEL, P.C.
*Attorneys for Petitioner-Plaintiff*

By: _____

Steven Barshov
460 Park Avenue
New York, New York 10022
(212) 421-2150
(212) 421-1891 (fax)

Ronald S. Kossar, Esq.
402 East Main Street
Middletown, New York 10940
(845) 343-5111
(845) 343-5222 (fax)

</div>

47

## VERIFICATION

**STEVEN BARSHOV**, an attorney admitted to the practice of law before the courts of the State of New York, and not a party to the above-entitled cause, affirm the following to be true under the penalties of perjury pursuant to CPLR 2106:

I am the attorney for the Petitioner-Plaintiff in the foregoing Hybrid Article 78 Petition and Verified Complaint (the "Verified Petition-Complaint"). I have read the foregoing Verified Petition-Complaint and the contents thereof are true and correct based on my own knowledge, except as to those matters therein stated as alleged upon information and belief, and as to those matters, I believe them to be true. As to matters alleged on information, the basis of my belief and the source of my information are case records and publicly available information. I make this Verification because Petitioner-Plaintiff is a corporate entity whose office is not in the county where I maintain my office.

STEVEN BARSHOV